Slip Op. 19-111

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| JIANGSU ZHONGJI LAMINATION MATERIALS CO., (HK) LTD., JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD., JIANGSU ZHONGJI LAMINATION MATERIALS STOCK CO., LTD. AND JIANGSU HUAFENG ALUMINIUM INDUSTRY CO., LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>ALUMINIUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS,<br><br>Defendant-Intervenors. | Before: Gary S. Katzmann, Judge<br>Court No. 18-00091<br><br>*PUBLIC VERSION* |

## OPINION

[The court grants Commerce's request for a remand to reassess its VAT calculation and sustains Commerce's determinations on all other issues.]

Dated: August 15, 2019

James C. Beaty and Sarah M. Wyss, Mowry & Grimson, PLLC, of Washington, DC, argued for plaintiff. With them on the brief were Jeffrey S. Grimson and Jill A. Cramer.

Aimee Lee, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel on the brief was Khalil N. Gharbieh, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

**PUBLIC VERSION**

<u>John H. Herrmann</u> and <u>Joshua R. Morey</u>, Kelley Drye & Warren, LLP, of Washington, DC, argued for defendant-intervenors. With them on the brief were <u>Paul C. Rosenthal</u>, <u>Kathleen W. Cannon</u>, and <u>Grace W. Kim</u>.

Katzmann, Judge: This case involves a challenge to the Department of Commerce's ("Commerce") selection of surrogate values for exports from a nonmarket economy in an antidumping duty investigation.   Plaintiff Jiangsu Zhongji Lamination Materials Company ("Zhongji"), a mandatory respondent in Commerce's investigation on aluminum foil from the People's Republic of China ("PRC"), appeals Commerce's dumping margin determination to this court.  Specifically, Zhongji argues that Commerce erred in: (1) selecting South Africa rather than Bulgaria as the primary surrogate country to value respondents' inputs; (2) relying on inferior data when valuing international freight; (3) valuing Zhongji's aluminum scrap using the incorrect Harmonized Tariff Schedule ("HTS") classification; (4) calculating Zhongji's value-added tax ("VAT") adjustment based on the wrong transaction; and (5) deferring its preliminary determination beyond the statutory deadline.  The court grants Commerce's request for a remand to reassess its VAT calculation and sustains Commerce's determinations on all other issues.

### *JURISDICTION AND STANDARD OF REVIEW*

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(i).  The standard of review in antidumping duty proceedings is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he Court shall hold unlawful any determination, finding, or conclusion" of Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."

## BACKGROUND

### I.   *Legal and Regulatory Framework for Surrogate Value Selections.*

Dumping occurs when a foreign company sells a product in the United States for less than

"fair value" – that is, for a lower price than in its home market.  Sioux Honey Ass'n v. Hartford

Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012).  To prevent dumping, Congress enacted the

Tariff Act of 1930 ("Act"), which empowered Commerce to investigate the extent to which an

imported product is being dumped and impose offsetting duty rates.  Id. at 1047.  The Act allows

various interested parties, including domestic trade or business associations in the affected

industry, to petition Commerce to initiate an antidumping duty investigation.   19 U.S.C.

§§ 1673a(b)(1), 1677(9)(E)–(F).

Once Commerce has initiated an investigation, it determines whether dumping is occurring

by comparing the export price of the merchandise in question with the "normal value" of the

merchandise when it is sold for consumption in the exporting country.   19 U.S.C.

§ 1677b(a)(1)(B)(i).  If the subject merchandise is exported from a nonmarket economy country

and Commerce finds that available information is therefore insufficient for a standard normal value

calculation, Commerce values the merchandise using surrogate values for "the factors of

production utilized in producing the merchandise" and "an amount for general expenses and profit

plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B).  Factors

of production include labor, raw materials, energy and other utilities, and representative capital

costs including depreciation.  19 U.S.C. § 1677b(c)(3)(A)–(D).

To select a market economy country from which it will draw surrogate values, Commerce

first requests that its Enforcement and Compliance Office of Policy assemble a list of countries

that are, "to the extent possible," (A) "at a level of economic development comparable to that of

the nonmarket economy country," and (B) "significant producers of comparable merchandise."  19

U.S.C. § 1677b(c)(4)(A)–(B).  Commerce has the discretion to "mix and match" surrogate country

values with more accurate market-based values to the extent the latter are available in the exporting

country, Lasko Metal Prods. v. United States, 16 CIT 1079, 810 F. Supp. 314, 316 (1992), aff'd

43 F.3d 1442 (Fed. Cir. 1994), but Commerce normally prefers to value all factors in a single

surrogate country.  19 C.F.R. § 351.408(c)(2); see also Jiaxing Bro. Fastener Co. v. United States,

822 F.3d 1289, 1302 (Fed. Cir. 2016) (finding no error in Commerce basing its decision on a

preference for a single surrogate when multiple surrogates' data is otherwise equally usable);

Clearon Corp. v. United States, 2013 Ct. Intl. Trade LEXIS 27 at *20–21 (Feb. 20, 2013) (finding

that Commerce's preference for a single surrogate country is reasonable because it "limits the

amount of distortion introduced into its calculations").

     When several countries meet these threshold criteria, Commerce decides which among

them offers the "best factors data" with preference for the following: "investigation or review

period-wide price averages, prices specific to the input in question, prices that are net of taxes and

import duties, prices that are contemporaneous with the period of investigation or review, and

publicly available data."  Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection

Process  (Mar. 1, 2004)  (available at: http://enforcement.trade.gov/policy/bull04-1.html)

(hereinafter "Policy Bulletin 04.1").

     Statute requires Commerce to value a respondent's factors of production using the "best

available information."  19 U.S.C. 1677b(c)(1)(B).  "Commerce has broad discretion to determine

what constitutes the best available information, as this term is not defined by statute."  Qingdao

Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014); see also QVD Food

Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  The data selected need not be perfect.

Home Meridian Int'l, Inc. v. United States, 772 F.3d 1289, 1296 (Fed. Cir. 2014).

In reviewing Commerce's choice of information, "[the] court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'"  Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)).  The reviewing court must consider "the record as a whole, including that which 'fairly detracts from its weight,'" Nippon Steel Corp .v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera v. NLRB, 340 U.S. 474, 477 (1951)), and must affirm Commerce's conclusion "if it is reasonable and supported by the record as a whole, even if some evidence detracts from the [agency]'s conclusion." Id. at 1352 (quoting Altx, Inc. v. United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

## II.        Factual and Procedural History of the Antidumping Order

### A.        Petition and Selection of Respondents

Commerce received an antidumping duty petition concerning imports of certain aluminum foil from the PRC, filed on behalf of the Aluminum Association Trade Enforcement Working Group and its individual members ("Defendant-Intervenors").  See Letter on Behalf of Petitioners to the Dep't re: Petitions for the Imposition of Antidumping and Countervailing Duties (Mar. 9, 2017), P.R. 1–11.  In response, Commerce initiated an antidumping duty investigation on aluminum foil from the PRC.  See Certain Aluminum Foil from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation, 82 Fed. Reg. 15,691 (Dep't Commerce Mar. 30, 2017), P.R. 35.  After receiving responses to a quantity and value questionnaire from 26

companies, Commerce selected Zhongji as one of three mandatory respondents[1] for individual examination.  See Mem. re: Respondent Selection (May 22, 2017), P.R. 177.  The other mandatory respondents were Dingsheng Aluminum Industries (Hong Kong) Trading Co. Ltd. and Hangzhou Dingsheng Import & Export Co. Ltd. (collectively, "Dingsheng").  Id.

### B.      *Comments on Surrogate Value Selection*

Commerce entered into the record a list of six market economy countries satisfying the threshold criteria of 19 U.S.C. § 1677b(c)(4): Brazil, Mexico, Romania, Bulgaria, South Africa, and Thailand (collectively, "list countries").  See Mem. to Michael J. Heaney from Carole Showers re: Request for List of Surrogate Countries (May 23, 2017), P.R. 182.  Commerce invited interested parties to submit comments concerning the selection of the primary surrogate country, whether other countries should be considered, and the selection of information to value the respondents' factors of production.  See Letter re: Request for Economic Development, Surrogate Country, and Surrogate Value Comments and Information (May 24, 2017), P.R. 181.

Parties submitted comments on Commerce's selection of the primary surrogate country. Zhongji suggested that other countries besides those on the list might satisfy the statutory

---

[1]  In antidumping duty investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin determinations [in investigations or administrative reviews] because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to—
>
> > (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or
> >
> > (B) exporters and producers accounting or the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

**_PUBLIC VERSION_**

requirements but did not identify any specific alternatives.  See Letter Pertaining to Jiangsu

Zhongji Surrogate Country Comments at 2–4 (June 23, 2017), P.R. 203.  Dingsheng commented

that all six list countries were economically comparable to the PRC and that five of the six list

countries -- all except Mexico -- were significant producers of comparable merchandise.  See

Letter on Behalf of Dingsheng re: Surrogate Comments at 2–3 (June 23, 2017), P.R. 205.

Defendant-Intervenors also commented that all six list countries were economically comparable

and noted that only South Africa and Bulgaria were net exporters of aluminum foil during the POI.

See Letter on Behalf of Petitioners re: Surrogate Country Comments at 3–4 (June 23, 2017), P.R.

204.  Defendant-Intervenors stated that they were unable to identify the best surrogate country

from the list at this time because (1) respondents Zhongji and Dingsheng had not yet responded to

Section D of Commerce's antidumping questionnaire and (2) issues relating to the level of vertical

integration of the respondents were not clearly established on the administrative record.  Id. at 4–

6.

       Defendant-Intervenors argued in rebuttal comments that, in determining whether list

countries were significant producers of comparable merchandise, Commerce should not use HTS

heading 7606 as proposed by Dingsheng because the aluminum plate and sheet in that subheading

are thicker than the aluminum foil produced by the respondents.  Instead, Defendant-Intervenors

argued that the aluminum foil is better classified under heading 7607.  See Letter on Behalf of

Petitioners re: Surrogate Country Rebuttal Comments at 2 (June 28, 2017), P.R. 210.

       Defendant-Intervenors, Dingsheng, and Zhongji began submitting preliminary surrogate

value comments and information on July 17, 2017.  Defendant-Intervenors submitted publicly

available information from South Africa to value respondents' factors of production and a 2016

financial statement of South African aluminum foil producer Hulamin to value respondents'

***PUBLIC VERSION***

financial ratios.  See Letter on Behalf of Petitioners re: Petitioners' Submission of South African

Surrogate Value Info at 1–5 (July 17, 2017), Ex. ZA-1–ZA-5, ZA-7, P.R. 243–49.  Pursuant to

Policy Bulletin 10.2: Inclusion of International Freight Costs When Import Prices Constitute

Normal Value (Nov. 1, 2010) (available at: https://enforcement.trade.gov/policy/PB-10.2.pdf),

Defendant-Intervenors submitted values for freight and marine insurance so that Commerce could

adjust the South African import values, which were reported on a free on board ("FOB") basis, to

a cost insurance and freight ("CIF") basis.[2]  See Letter on Behalf of Petitioners re: Petitioners'

Submission of South African Surrogate Value Info at 2–3.

Dingsheng submitted publicly-available information from Bulgaria, including a 2016

financial statement from Bulgarian aluminum foil producer Alcomet, to value its factors of

production and financial ratios.  See Letter on Behalf of Dingsheng re: Dingsheng's First Surrogate

Value Submission at Exs. 1–6 (July 17, 2017), P.R. 231–32.  Dingsheng also submitted ocean

freight rates from a database published by Descartes.  Id. at Exs. 7–11.  Zhongji submitted publicly-

available Bulgarian data to value its factors of production and financial ratios, see Letter on Behalf

of Zhongji re: Surrogate Value Selection Comments at 2–5, Exs. SV-1–SV-7, SV-9–SV-10 (July

17, 2017), P.R. 237–42, and submitted proprietary international freight values from Xeneta.  Id. at

5, Ex. SV-8.

---

[2]  Commerce prefers surrogate values reported on a CIF basis rather than a FOB basis because CIF values "include the costs associated with purchasing these inputs from foreign exporters, including brokerage and handling, marine insurance, and international freight because this is the price that is most representative of a domestic price for the input in the surrogate country."  See Steel Racks and Parts Thereof from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 7,326 (Dep't Commerce Mar. 4, 2019), and accompanying Issues and Dec. Mem. at 13.  "[W]hen the import statistics of the surrogate country do not include such [CIF] costs, [Commerce] has added surrogate values for international freight and foreign brokerage and handling charges to the calculation of normal value."  Policy Bulletin 10.2: Inclusion of International Freight Costs When Import Prices Constitute Normal Value (Nov. 1, 2010) (available at: https://enforcement.trade.gov/policy/PB-10.2.pdf).

Zhongji, Dingsheng, and Defendant-Intervenors all submitted surrogate value rebuttal comments on July 31, 2017.  Zhongji argued that the South African data submitted by Defendant-Intervenors were not appropriate because: (1) certain South African surrogate values were distorted by subsidies; (2) the values from Bulgaria were more specific to Zhongji's inputs than the South African values; and (3) the South African labor value was less contemporaneous with the POI.  See Letter on Behalf of Zhongji re: Rebuttal Surrogate Value Comments at 3–13 (July 31, 2017), P.R. 271.  Zhongji also argued that Commerce should rely on the Xeneta data submitted by Zhongji to value international freight because Xeneta based its rates on a larger and more representative sample.  Id. at 13.

Dingsheng argued in its rebuttal comments that: (1) export controls distorted the South African metal market; (2) Hulamin's production experience did not represent that of the respondents; and (3) Defendant-Intervenors' labor values were incorrectly based on a 40-hour work week.  See Letter on Behalf of Dingsheng re: Rebuttal Surrogate Value Comments (July 31, 2017), P.R. 270.

Defendant-Intervenors argued in their rebuttal comments that: (1) Zhongji's value submissions for labor, energy, and various material and packing inputs relied on information that was incorrect and unsupported by the record; and (2) use of proprietary Xeneta values for international freight was inappropriate and inconsistent with Commerce's practice of relying on publicly available values.  See Letter on Behalf of Petitioners re: Surrogate Value Rebuttal Information and Comments at 2–22 (July 31, 2017), P.R. 275–76.

### C.       *Preliminary Determination and Case Briefs to Commerce*

Commerce deferred its preliminary determination beyond the statutory deadline in order to allow full review of the PRC's status as a nonmarket economy.  See Letter re: Deferral of

Preliminary Determination (Oct. 13, 2017), P.R. 331.  In its affirmative preliminary determination of sales at less-than-fair value, Commerce concluded that the PRC was still a nonmarket economy and selected South Africa as the primary surrogate market economy country to value the respondents' inputs.  See Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination, 82 Fed. Reg. 50,858 (Dep't Commerce Nov. 2, 2017) ("Preliminary Determination"), P.R. 342, and accompanying decision memorandum (Dep't Commerce Oct. 26, 2017), P.R. 336 ("PDM").

 The parties had only submitted surrogate value data for Bulgaria and South Africa, so Commerce assessed which of those two countries provided the best available data by considering whether the data were publicly available, contemporaneous with the POI, representative of a broad market average, tax and duty-exclusive, and specific to the inputs being valued.  PDM at 10.  Commerce concluded that the South African data were the best available because

> the record contains complete, publicly available, contemporaneous, and specific
> South African data which represent a broad market average, and which are tax and
> duty exclusive, for the majority of inputs used by the respondents to produce subject
> merchandise during the POI. In addition, the South African surrogate financial
> statements on the record include publicly available statements for a company which
> produces identical merchandise.

PDM at 11 (internal footnotes omitted).

Using South Africa as the primary surrogate country, Commerce preliminarily calculated antidumping margins of 96.81 percent for Zhongji and 162.24 percent for Dingsheng.  PDM at 21.  Commerce verified Zhongji's sales and factors of production responses from December 4, 2017 to December 11, 2017 and issued a report on its verification.  See Mem. re: Verification of the Questionnaire Responses of Zhongji (Jan. 24, 2018), P.R. 425.

Zhongji filed an affirmative case brief arguing that Commerce's selection of South Africa over Bulgaria as the primary surrogate country was not supported by substantial evidence because: (1) Hulamin received countervailable aluminum industry subsidies; (2) Bulgarian producer Alcomet's financial statement was superior to Hulamin's; (3) South Africa's labor value data was less contemporaneous with the POI than Bulgaria's; (4) Bulgaria's import statistics were reported on a CIF basis, whereas South Africa's were reported on an FOB basis and required conversion to CIF; and (5) Bulgaria's surrogate values were more specific than South Africa's for certain factors of production. See Letter on Behalf of Zhongji re: Case Brief at 7–29 (Jan. 31, 2018), P.R. 431. Zhongji also argued that Commerce had erred in: (1) relying on Maersk data instead of Xeneta data to value international freight; (2) valuing Zhongji's aluminum scrap using HTS subheading 7602.00 (aluminum waste and scrap) instead of HTS subheading 7601.20 (unwrought aluminum: aluminum alloys); (3) calculating Zhongji's VAT adjustment based on the wrong transaction; and (4) deferring its preliminary determination beyond the statutory deadline. See id. at 37–44, 51–53.

Defendant-Intervenors argued in their case brief that Commerce's selection of South Africa was supported by substantial evidence because: (1) the alleged South African aluminum subsidies were not actionable under U.S. countervailing duty laws; (2) the Hulamin financial statement was sufficient to calculate surrogate financial ratios; (3) the absence of values for nitrogen and argon gas in the Bulgarian data rendered the South African data superior notwithstanding the lack of contemporaneous labor data from South Africa; (4) Commerce reasonably adjusted the South African FOB import statistics to CIF values; and (5) any additional specificity of the Bulgarian data was nullified by the respondents' mixing and modification of that data in their calculation of surrogate values. See Letter on Behalf of Petitioners re: Rebuttal Brief at 3–6, 11–28 (Feb. 6,

2018), P.R. 445–46.  Defendant-Intervenors also argued that Commerce: (1) correctly valued

Zhongji's aluminum scrap using HTS subheading 7602.00 (aluminum waste and scrap); (2)

correctly calculated Zhongji's VAT adjustment; (3) should rely on data from Maersk or the

Descartes data submitted by Dingsheng to value ocean freight, as the Xeneta data submitted by

Zhongji require a paid subscription and are not therefore publicly available; and (4) did not nullify

its preliminary determination by deferring past the statutory deadline.  See id. at 30–31, 43–47,

56–58, 60–62.

### D.     *Final Determination*

In its final determination, Commerce continued to select South Africa as the primary

surrogate country.  See Certain Aluminum Foil from the People's Republic of China: Final

Determination of Sales at Less Than Fair Value, 83 Fed. Reg. 9,282 (Dep't Commerce Mar. 5,

2018), P.R. 454, and accompanying issues and decision memorandum at 7–8 (Dep't Commerce

Feb. 26, 2018), P.R. 451 ("IDM").  Commerce concluded that the record contained South African

data for all factors of production, but that the record lacked usable Bulgarian data for nitrogen and

argon gases.  IDM at 8.  Commerce found no actionable subsidies in either the aluminum industry

or electricity in South Africa, and no evidence that Hulamin specifically benefitted from any

actionable subsidy.  Id. at 9.  Commerce decided that the methodology used to calculate financial

ratios from Hulamin's financial statement was consistent with methodology used by Commerce in

the past, eliminating any concern that the resulting surrogate values were flawed.  Id. at 10.

Commerce also rejected Zhongji's other arguments, deciding to: (1) value ocean freight

using data from Descartes instead of the proprietary Xeneta data; (2) value Zhongji's aluminum

scrap using HTS subheading 7602.00 for aluminum waste and scrap instead of subheading 7601.20

for unwrought aluminum; (3) apply the same methodology as in the PDM to adjust Zhongji's

VAT; and (4) reject Zhongji's claim that deferral beyond the statutory deadline voided its preliminary determination. Id. at 7–16, 18–23, 35.

Following the International Trade Commission's affirmative injury determination, Commerce published the antidumping duty order. Certain Aluminum Foil from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 83 Fed. Reg. 17,362 (Dep't Commerce Apr. 19, 2018), P.R. 468 ("Order").

### E.    Procedural History

On May 7, 2018, Zhongji filed a complaint with this court seeking review of Commerce's Order. Zhongji filed its brief on October 16, 2018. Mem. of Points and Auth. in Supp. of R. 56.2 Mot. for J. on the Agency R., Oct. 16, 2018, ECF Nos. 24-1, 25 ("Pls.' Br."). The Government and Defendant-Intervenors filed their response briefs on February 25, 2019. Def.'s Resp. to Mot. for J. Upon the Agency R., Feb. 25, 2019, ECF Nos. 33–34 ("Def.'s Br."); Def.-Inters.' Resp. in Opp'n to Pls.' Mot. for J. on the Agency R., Feb. 25, 2019, ECF Nos. 35–36 ("Def.-Inters.' Br."). Zhongji filed its reply brief on April 22, 2019. Reply Br. in Supp. of R. 56.2 Mot. for J. on the Agency R., Apr. 22, 2019, ECF Nos. 48–49 ("Pls.' Reply"). Oral argument was held on July 16, 2019. ECF No. 61.

### DISCUSSION

Zhongji's arguments before this court mirror the arguments in its affirmative brief to Commerce following Commerce's preliminary determination. Zhongji argues that Commerce erred in: (1) selecting South Africa as the primary surrogate country; (2) relying on Descartes data instead of Xeneta data to value international freight; (3) valuing Zhongji's aluminum scrap using the incorrect HTS classification; (4) calculating Zhongji's VAT adjustment based on the wrong

transaction; and (5) deferring its preliminary determination beyond the statutory deadline.  For the

reasons stated below, the court affirms Commerce's selection of South Africa as the primary

surrogate country for valuing Zhongji's factors of production, and affirms Commerce's selection

of data to value Zhongji's aluminum scrap and international freight.  Additionally, the court grants

Commerce's request for a remand to recalculate its VAT adjustment using the correct sale price.

Finally, the court finds that Commerce's violation of the statutory deadline in issuing its

affirmative preliminary determination did not negate that determination or the ensuing collection

of duty deposits.

### I.       *Commerce's Selection of South Africa as the Primary Surrogate Country Was Supported by Substantial Evidence.*

Zhongji contends that Commerce's selection of South Africa as the primary surrogate

country was unsupported by substantial evidence because the South African aluminum foil

industry was distorted by subsidies while the Bulgarian aluminum foil industry was not.  Pls.' Br.

at 11.  Commerce reasonably determined that the evidence presented by Zhongji failed to satisfy

the "reason to believe or suspect" standard for evaluating the presence of subsidies, and the

precedent cited by Zhongji is distinguishable.  Zhongji also claims that the financial statement of

South African aluminum foil producer Hulamin was inferior to the statement of Bulgarian

producer Alcomet because the Hulamin statement was distorted by subsidies and its labor values

required some estimation using a "headcount" method.  Pls.' Br. at 17.  Again, Commerce

reasonably concluded that the alleged subsidies failed to satisfy the "reason to believe or suspect"

standard, and Zhongji failed to show that the headcount estimation would distort values.  Finally,

Zhongji argues that the Bulgarian data were more specific regarding Zhongji's inputs and included

more contemporaneous labor data.  Pls.' Br. at 21.  Specificity and contemporaneity are not the

only factors Commerce weighs in selecting surrogate countries, and Zhongji supplies no evidence

that the less-specific South African data would distort surrogate values.  Commerce reasonably determined that the alleged flaws in the South African data were unsubstantiated or relatively insignificant, and the court therefore affirms Commerce's selection of South Africa as the primary surrogate country.

> ### A.   *Commerce Reasonably Concluded that South Africa's Aluminum Market Was Not Distorted by Subsidies.*

Zhongji claims that the South African aluminum foil industry was distorted by subsidies, and that Commerce therefore erred in selecting South Africa over Bulgaria as the primary surrogate country.  Pls.' Br. at 11.  When more than one country is at a comparable level of economic development to the nonmarket economy country in question and produces a significant amount of comparable merchandise, Commerce selects the primary surrogate country from the qualified candidates by deciding which country offers the best available information and the best factors data in accordance with Policy Bulletin 04.1.  When selecting surrogate values, Commerce declines to use prices that the agency has "reason to believe or suspect may be dumped or subsidized."  Weishan Hongda Aquatic Food Co. v. United States, 917 F.3d 1353, 1365 n.9 (Fed. Cir. 2019) (quoting H.R. Conf. Rep. No. 100-576 at 590–91 (1988), reprinted in 1988 U.S.C.C.A.N. 1623-24.).  In investigating whether a price is subsidized, the statute's drafters did not "intend for Commerce to conduct a formal investigation . . . but rather intend[ed] that Commerce base its decision on information generally available to it at the time."  Id.

Zhongji contends that Commerce's selection of South Africa was unsupported by substantial evidence because there was reason to believe or suspect that South African aluminum foil prices were distorted by subsidies.  Pls.' Br. at 11.  Specifically, Zhongji cites a Gauteng High

***PUBLIC VERSION***

Court[3] decision and Organization for Economic Cooperation and Development ("OECD") report

showing that South Africa engaged in domestic price supports and export restraints on scrap metals

to make South African aluminum producers more competitive.  Id. at 9.  According to Zhongji,

this evidence satisfies the three-pronged test for the "believe or suspect" standard implemented by

this court in Fuyao Glass Indus. Grp. Co. v. United States, 29 CIT 109 (2005):

> to justify a finding with respect to subsidization, Commerce must demonstrate by
> specific and objective evidence that (1) subsidies of the industry in question existed
> in the supplier countries during the period of investigation; (2) the supplier in
> question is a member of the subsidized industry or otherwise could have taken
> advantage of any available subsidies; and (3) it would have been unnatural for a
> supplier to not have taken advantage of such subsidies.

Id. at 114.  Zhongji claims that even if the South African aluminum foil industry did not directly

benefit from a government subsidy, it indirectly benefitted from the suppression of metal scrap

prices as the market adjusted to the influx of price-controlled scrap.  Pls.' Br. at 13.  These

arguments are unpersuasive.

 The subsidies alleged by Zhongji do not meet the "reason to believe or suspect" standard.

When there is evidence of a potential subsidy but Commerce has not previously found the specific

program to be countervailable, Commerce does not per se reject the data in question and requires

evidence of distortion before it will reject it.  See Yantai Xinke Steel Structure Co. v. United States,

2014 Ct. Intl. Trade LEXIS 39 at *61 (Apr. 9, 2014).  Commerce had not found the alleged

subsidies to be countervailable, and evidence of distortion was therefore required to compel

---

[3]  In South Africa, High Courts have general jurisdiction over matters arising within the defined
geographic area in which they are situated.  Courts in South Africa, DEPARTMENT OF JUSTICE AND
CONSTITUTIONAL DEVELOPMENT, http://www.justice.gov.za/about/sa-courts.html (last visited July
26, 2019).  They usually hear serious criminal cases, civil cases with large amounts in controversy,
and appeals from lower Magistrate courts within their geographic jurisdiction.  Id. High Court
decisions may be appealed to the Supreme Court of Appeal or, in the case of constitutional matters,
to the Constitutional Court.  Id.

Commerce to reject the South African data.  Def.'s Br. at 15.  Additionally, Commerce is not required to follow the Fuyao framework advocated for by Zhongji.  See Gold East Paper (Jiangsu) Co. Ltd. v. United States, 39 CIT __, __, 121 F. Supp. 3d 1304, 1307–08 (2015) (finding that Fuyao is not the only reasonable method for evaluating whether evidence meets the believe or suspect standard).  Even if it were, the Fuyao court stated that Commerce should demonstrate each prong with "specific and objective evidence," which Zhongji has not provided.  29 CIT at 114. The OECD report and Gauteng High Court decision suggest that subsidy programs may have existed in South Africa, but do not specify that Hulamin, the South African aluminum foil producer in question, participated in such programs.  Hulamin's financial statement acknowledges the existence of government assistance programs, but the mere mention of a subsidy is insufficient to disqualify surrogate data without further evidence that the company actually received the subsidy. See Clearon Corp. v. United States, 35 CIT 1685, 800 F. Supp. 2d 1355, 1358 (2011); infra p. 19. The alleged subsidies thus did not meet the "reason to believe or suspect" standard.

Zhongji also claims that Commerce should have followed past cases in which it found similar subsidies to be countervailable.  Pls.' Br. at 14.   Zhongji cites a countervailing duty investigation in which Commerce found export restraints on Chinese primary aluminum to be countervailable.   See Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination, 83 Fed. Reg. 9,274 (Dep't Commerce Mar. 5, 2018).  The facts of that investigation are distinguishable from the present case.  Most importantly, the Chinese policy was the subject of a countervailing duty investigation by Commerce, and the South African policy is not.  Additionally, the two cases address different countries (South Africa and the PRC) and different products (aluminum scrap and primary aluminum), and the government programs in question are different: the PRC was imposing a 30 percent export tariff on the subject merchandise,

whereas South Africa was requiring the subject merchandise to be offered to domestic users at a 20 percent discount before being exported. Pls.' Br. at 9, 14. Given the difference in circumstances, Commerce was not bound by any prior findings of countervailability in investigating the South African policies.

Zhongji further contends that South African aluminum foil producers received subsidies in the form of preferential electricity rates. Id. at 19. Commerce had not previously found South African electricity rates to be countervailable; nonetheless, Zhongji alleges that Commerce's decision here was unreasonable because, in a past investigation involving Canadian paper, Commerce found preferential electricity rates to be countervailable. Id. (citing Supercalendared Paper From Canada: Final Affirmative Countervailing Duty Determination, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015)). Again, the determination cited is distinguishable: there, the policy in question was already subject to a countervailable subsidy investigation, unlike the electricity rates in the present case, and here there is no evidence of distortion to satisfy the standard put forth in Yantai Xinke. Commerce was therefore justified in declining to infer that electricity subsidies had distorted the South African aluminum foil market. Thus, given the lack of evidence of distortion by subsidies in the South African aluminum foil market, Commerce reasonably selected South Africa as the primary surrogate country.

**B.      *Commerce Reasonably Relied on Hulamin's Financial Statement.*

Zhongji claims that subsidies for aluminum scrap and electricity distorted the financial statement of South African aluminum foil producer Hulamin, and that Commerce therefore erred in relying on that statement for surrogate values. Pls.' Br. at 17. As discussed above, when there is evidence of a potential subsidy but Commerce has not previously found the specific program to be countervailable, Commerce does not per se reject the data and requires evidence of distortion

before it will reject it.  See Yantai Xinke, 2014 Ct. Intl. Trade LEXIS at *61.  In reviewing financial

statements for evidence of countervailable distortions, "a mere mention that a subsidy was

received, and for which there is no additional information as to the specific nature of the subsidy"

is insufficient for Commerce to exclude the statement.  See Clearon Corp., 800 F. Supp. 2d at

1358.  The Hulamin statement denoted that "[s]crap export legislation will continue to promote

local processing of scrap for the benefit of local industry," but Zhongji provides no evidence that

Hulamin received a specific subsidy or that South Africa's export controls on metal scrap affected

Hulamin's production and sale of aluminum foil.   See Letter on Behalf of Petitioners re:

Submission of South African Surrogate Value Info at Ex. ZA–7 (July 17, 2017), P.R. 243–49.  As

discussed in the preceding section, Commerce was justified in finding that the South African

aluminum foil industry, including Hulamin, was not distorted by subsidies on aluminum scrap or

electricity.

Zhongji also alleges that Commerce unreasonably selected Hulamin's financial statement

over that of Bulgarian aluminum foil producer Alcomet because the Hulamin statement required

Commerce to estimate how labor costs were split between production and other activities using a

headcount method.  Pls.' Br. at 20 (citing IDM at 10).  Commerce determined in its analysis that

the Alcomet statement contained notes indicating that Alcomet's costs would require a potentially

distortive reallocation of financial ratios.  IDM at 11.  The headcount method used by Commerce

to analyze the Hulamin statement was consistent with Commerce's past practice, Id. at 10, and

Zhongji fails to show that use of the headcount method was more likely to distort surrogate values

than the adjustments that would have been required to analyze the Alcomet statement.  Commerce

therefore had good reason to select the Hulamin statement over the Alcomet statement, and

Commerce reasonably relied on the Hulamin statement in its surrogate value calculations.

### C.   *The Relative Specificity of the Bulgarian Data Is Not Dispositive.*

Zhongji argues that Commerce erred in selecting South Africa as the primary surrogate country because Bulgaria's data was superior in various respects.  Pls.' Br. at 21.  Some of Zhongji's arguments in support of this proposition are addressed elsewhere in this opinion.[4] According to Zhongji, Commerce's selection of South Africa was also flawed because Bulgaria's data was reported at the more specific eight-digit level of HTS product classification codes, while the South African data was only available at the six-digit level.  Id.  Zhongji claims that the eight-digit codes more accurately classify several of its major inputs including foil stock, rolling oil, rolling oil additive, and packing materials.  Id. at 22–26.  Several factors undermine this contention: (1) several of respondent Dingsheng's inputs were more accurately classified by the six-digit South Africa codes; (2) Dingsheng had proposed averaging several eight-digit codes to value its inputs, nullifying any increased specificity offered by those codes; and (3) Zhongji failed to show that the six-digit classifications would notably distort Commerce's valuations of its products.  There is therefore insufficient evidence that the increased specificity of the Bulgarian data is meaningful to Commerce's calculations, and even if the Bulgarian data were more specific for some inputs, Zhongji puts forth no convincing evidence that the specificity consideration should outweigh the lack of usable data for nitrogen or argon gases in the Bulgarian data.

---

[4]   Zhongji contends that the South African data required an FOB-to-CIF adjustment while the Bulgarian data did not.  Pls.' Br. at 31.  As discussed in section III below with regards to the international freight issue, Zhongji failed to show that the CIF adjustment would necessarily result in distortion.  Zhongji also claims that the electricity rates used by Commerce fail to capture the preferential rates that may be available to aluminum foil producers.  Id. at 35.  As discussed in section I.A above with regards to the subsidies issue, Commerce was reasonable in declining to infer based on no clear evidence that the South African aluminum foil market was distorted by preferential electricity rates.  In the absence of clear evidence that these differences between the countries' data would actually undermine the accuracy of its calculations, Commerce was reasonable in selecting South Africa.

Zhongji also contends that the Bulgarian data is superior because its labor data is contemporaneous with the POI and therefore superior to the South African labor data. Id. at 33. Contemporaneity is only one of several factors Commerce weighs in selecting among qualified surrogate country candidates under Policy Bulletin 04.1, and the South African labor data satisfied the other factors: investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, and publicly available data. Commerce may also prioritize valuing all surrogate values in a single country, a factor which here favored South Africa. 19 C.F.R. § 351.408(c)(2). Commerce was therefore justified in using the South African labor data despite its lack of contemporaneity because the other factors favored the South African data as a whole over the Bulgarian data. Bulgaria's data also suffered from a lack of contemporaneity, as its nitrogen and argon gas values were so outdated they could not be reliably inflated and were therefore unusable. For these reasons, the greater specificity of the Bulgarian data is offset by other considerations and otherwise not determinative of the superior primary surrogate country, and Commerce was therefore justified in selecting South Africa.

### D.     The Record as a Whole Supported Selecting South Africa.

Whether it be specificity, contemporaneity, or subsidies, no one flaw in the South African data is sufficient to overrule Commerce's discretion in selecting South Africa as the primary surrogate country. Nonetheless, Zhongji argues that it is no single flaw but the totality of relative inadequacies in the South African data that should have compelled Commerce to select Bulgaria instead. Pls.' Br. at 36. Ultimately, Zhongji claims that Commerce weighed the flaws in the South African data too lightly and those in the Bulgarian data too heavily. In reviewing Commerce's selection of the best available information, it is not this court's duty "to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could

conclude that Commerce chose the best available information." <u>Zhejiang</u>, 652 F.3d at 1341

(quoting <u>Goldlink</u>, 431 F. Supp. 2d at 1327).   For the reasons discussed above, Commerce

reasonably analyzed the data sets and weighed their relative merits and flaws in accordance with

the relevant statutes and regulations.   The court therefore affirms Commerce's selection of South

Africa as the primary surrogate country.

### II.     *Commerce's Selection of Data to Value Zhongji's Aluminum Scrap Was Supported by Substantial Evidence.*

Commerce chose to value Zhongji's aluminum scrap using HTS subheading 7602.00,

described as "Aluminum Waste and Scrap."   <u>See</u> Mem. re: Surrogate Value for the Preliminary

Determination at 5 (Oct. 26, 2017), P.R. 344.   Zhongji contends that given the high aluminum

content of its scrap, HTS subheading 7601.20 ("Unwrought aluminum: Aluminum alloys") was

more appropriate, and that Commerce had unreasonably ignored record evidence in deciding

otherwise.   Pls.' Br. at 36.   Commerce based its decision on the fact that Zhongji "accounted for

and sold [the material in question] as scrap," and failed to demonstrate that its aluminum scrap was

different from other aluminum scrap commonly available in the South African market.   <u>IDM</u> at

35.   For the reasons discussed below, the court finds that Commerce acted within its discretion to

decide what constitutes the "best available information" when it chose to value Zhongji's

aluminum scrap using the HTS subheading that best matched the classification under which

Zhongji was selling the scrap, rather than a subheading that may have better accounted for the

scrap's chemical composition.   <u>Qingdao</u>, 766 F.3d at 1386 (affirming that Commerce has broad

discretion to determine what constitutes the best available information).   Commerce's selection of

surrogate values for the scrap was therefore supported by substantial evidence, and is affirmed.

Zhongji claims that Commerce failed to consider "prices specific to the input in question"

as required by <u>Policy Bulletin 04.1</u> because Zhongji's scrap was more specifically classified as

pure aluminum than aluminum scrap, but the record does not support that contention.  Pls.' Br. at 37.  Zhongji claims that its scrap was pure enough to be reintroduced into the production process, id., but the aluminum scrap's chemical composition was of little consequence given the manner in which Zhongji actually disposed of its aluminum scrap.[5]  See Letter on Behalf of Zhongji re: Section C & D Questionnaire Response of Zhongji at Ex. D-8 (July 6, 2017), C.R. 197–98.  Commerce therefore had reason to value the scrap using subheading 7602.00.

Zhongji argues that Commerce arbitrarily valued Zhongji's aluminum scrap and Dingsheng's recycled aluminum byproduct using different HTS subheadings.  Pls.' Br. at 37.  This argument is unpersuasive because the two respondents were not similarly situated regarding this issue.  Commerce valued Zhongji's aluminum scrap and Dingsheng's aluminum scrap using the same subheading, 7602.00.  See Memo re: Surrogate Values for the Final Determination at Attach. 1 (Feb. 26, 2018), P.R. 456.  Zhongji claims that Commerce should have valued Zhongji's aluminum scrap using the same subheading 7601.20 used to value Dingsheng's recycled aluminum byproduct, as Zhongji's scrap was more chemically similar to Dingsheng's recycled aluminum byproduct than to Dingsheng's aluminum scrap.  Pls.' Br. at 37.  This argument fails to account for the fact that Zhongji and Dingsheng disposed of their aluminum scrap and aluminum byproduct in very different ways.  See supra n.5; Letter on Behalf of Zhongji re: Section C & D Questionnaire

_____

[5]  [[



        ]]

Response of Zhongji at Ex. D-17 (July 6, 2017), C.R. 197–98; Letter on Behalf of Dingsheng re:

Questionnaire Section D Response at 22–23, Ex. D-6 (July 10, 2017), C.R. 221–22.  Commerce

was consistent in basing its selection of the best available information on the manner in which the

respondents actually used the aluminum in question rather than on the aluminum's chemical

composition, and its valuation of Zhongji's aluminum scrap was thus neither arbitrary nor

capricious and was consistent with the record.  Commerce's selection of data to value Zhongji's

aluminum scrap was supported by substantial evidence and in accordance with law, and is

affirmed.

### III. *Commerce's Selection of Data to Value Zhongji's International Freight Was Supported by Substantial Evidence.*

The cost of international freight is included in the factors of production for which

Commerce must obtain surrogate values.  See, e.g., China Mfrs. All., LLC v. United States, 43

CIT __, 357 F. Supp. 3d 1364, 1368 (2019).  Commerce must therefore, when applicable, select

the best available information to value international freight based on its weighing of the factors

listed in Policy Bulletin 04.1.  Commerce regulations state a preference for publicly available data

to value inputs.  19 C.F.R. § 351.408(c)(1).

Commerce acted within its discretion in selecting data from Descartes over data from

Xeneta to value Zhongji's international freight costs.   Both datasets have advantages and

disadvantages.  The Descartes data are not contemporaneous with the POI, rely on fewer data

points, and require an FOB-to-CIF adjustment, but are publicly available and free of taxes and

import duties.  Def.'s Br. at 37–39.  Although the Xeneta data are contemporaneous and rely on

more data points, they are proprietary and therefore not publicly available.  Id.  Commerce's

decision to weigh these factors in favor of the Descartes data, in light of the regulatory preference

for publicly available data, is reasonable and therefore affirmed.  See Nippon Steel, 458 F.3d at

1352.

Zhongji argues that the Xeneta data are available to Commerce despite their proprietary

nature and cites two past proceedings in which Commerce deemed international freight

information to be publicly available based on its availability to the government: Certain Stilbenic

Optical Brightening Agents From the People's Republic of China: Preliminary Determination of

Sales at Less than Fair Value and Postponement of Final Determination, 76 Fed. Reg. 68,153

(Dep't Commerce Nov. 3, 2011) (unchanged in final determination); Certain Steel Wheels From

the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair

Value, Partial Affirmative Preliminary Determination of Critical Circumstances, and

Postponement of Final Determination, 76 Fed. Reg. 67,702 (Dep't Commerce Nov. 2, 2011)

(unchanged in final determination).  Both are distinguishable from the present case because in

those proceedings, unlike here, (1) respondents demonstrated that the database in question was

available to Commerce without charge and (2) no party requested proprietary treatment of the data

at issue.  Commerce's determination that the Xeneta data were not publicly available was thus

within its discretion and consistent with its past practice.

Zhongji's argument that the FOB-to-CIF adjustment required for the Descartes data would

be distortive is also unpersuasive.  Pls.' Br. at 39–40.  Zhongji argues that Commerce's use of

Maersk data to adjust the Descartes freight data from an FOB basis to a CIF basis was erroneous,

because Commerce had rejected Maersk's data for valuing the international freight itself and

because the Maersk data was derived from only two ports.  Id.  Commerce's choice to use Maersk

data to value the FOB-to-CIF adjustment but not the base freight rates was reasonable because the

record contained supporting documentation for the former but not the latter.  See Ministerial Error

Mem. at 3–4 (Apr. 12, 2018), P.R. 465; Letter on Behalf of Petitioners re: Surrogate Value Info at

Ex. ZA-1 (July 17, 2017), P.R. 243–49.  Though the Maersk data was based on imports from only

two ports, those ports were of specific relevance to South African import data.  See Ministerial

Error Mem. at 4.  Zhongji failed to show that adjusting the Descartes data to a CIF basis using

Maersk data was likely to distort surrogate values, and the need for the adjustment should therefore

not weigh against the selection of Descartes over Xeneta.  Thus, Commerce's selection of data to

value Zhongji's international freight costs was supported by substantial evidence and in

accordance with law, and is affirmed.

### IV.    Commerce's VAT Adjustment Calculation Is Remanded.

Commerce is required to reduce the constructed export price of subject merchandise by

"the amount . . . of any export tax, duty, or other charge imposed by the exporting country on the

exportation of the subject merchandise to the United States."   19 U.S.C. § 1677a(c)(2)(B).

Pursuant to this requirement, Commerce reduces the export price in nonmarket economy dumping

margin calculations by "the amount of export taxes and similar charges, including [VATs] not

rebated upon export."  Methodological Change for Implementation of Section 772(c)(2)(B) of the

Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings, 77

Fed. Reg. 36,481 (Dep't Commerce June 19, 2012).

Commerce based its VAT calculation in this case on the U.S. price of Zhongji's

merchandise on resale by Zhongji HK, instead of on the price at which Zhongji sold the

merchandise to Zhongji HK.  Pls.' Br. at 40–41.  Zhongji pays no VAT on the markup between

itself and Zhongji HK, and adds no inputs at that phase.  Id.  The Chinese government made its

final assessment of VAT on the sale price to Zhongji HK.  Letter on Behalf of Zhongji to

Commerce re: Case Brief at 51 (Jan. 31, 2018), P.R. 431 ("Admin. Case Br.").

**PUBLIC VERSION**

On remand in Fine Furniture (Shanghai), Ltd. v. United States ("Fine Furniture"), 40 CIT

__, 182 F. Supp. 3d 1350 (2016), Commerce addressed a very similar fact pattern.  In that case, a

Chinese producer argued that Commerce had erred in basing its VAT calculation on the U.S. price

of its merchandise when sold by an affiliated reseller.  Id. at 1357.  Commerce initially considered

the producer and affiliated reseller to be a single entity whose internal transactions did not

constitute export sales.  Id. at 1358–59.  On reconsideration after remand from CIT, Commerce

decided that the tax neutrality of the dumping margin calculation required that Commerce base the

VAT calculation on the sale by the producer to the affiliated reseller.  See Fine Furniture

(Shanghai) Ltd. v. United States, 42 CIT __, __, 321 F. Supp. 3d 1282, 1288 (2018).

Commerce acknowledges the similarity of this case to Fine Furniture and has accordingly

requested a remand to reconsider the price on which it based its VAT adjustment.  Def.'s Br. at

39–40.  The Federal Circuit has held that Commerce may "request a remand (without confessing

error) in order to reconsider its previous position . . . [if] it ha[s] doubts about the correctness of

its decision or that decision's relationship to [Commerce's] other policies."  SFK USA, Inc. v.

United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001).  The court may refuse a request to remand

that is "frivolous or in bad faith," but if Commerce's concern is "substantial and legitimate, a

remand is usually appropriate."  Id.  Given that Commerce's VAT deduction methodology in this

case appears to be directly counter to its ultimate methodology in Fine Furniture, Commerce has

a substantial and legitimate reason to request a remand here.  All parties agree that a remand to

base the adjustment calculation on the correct price would be appropriate.[6]  Therefore, the court

---

[6] Defendant-Intervenors argued in their brief that Commerce's initial VAT calculation was lawful,
but made it clear at oral argument that they had changed their position and supported a remand to
Commerce.

grants Commerce's request for a remand to recalculate its VAT adjustment using the correct sale

price.[7]

> **V.      *Commerce's Issuance of Its Preliminary Determination After the Statutory Deadline Did Not Preclude Issuance of an Affirmative Final Determination.***

Statute requires Commerce to issue its preliminary determination in antidumping

investigations "within 140 days after the date on which [Commerce] initiates an investigation" or

within 190 days after the initiation of an investigation in "extraordinarily complicated" cases.  19

U.S.C. §§ 1673b(b)(1)(A), 1673b(c)(1)(B).  All parties agree that Commerce violated even the

---

[7] Recent opinions of this court have addressed the broader issue of the legitimacy of the irrevocable VAT adjustment, and come to different conclusions.  See Aristocraft of Am., LLC v. United States, 42 CIT __, 331 F. Supp. 3d 1372, 1378 (2018) (questioning the link between the amount of input VAT paid and the adjustment made to the export price, and remanding the issue to Commerce for further explanation); Jacobi Carbons AB v. United States, 43 CIT __, 365 F. Supp. 3d 1344, 1356 (2019) (noting that Commerce's explanation if its VAT calculation methodology in that case differed significantly from the explanation given by Commerce in Aristocraft, and allowing the adjustment).  Zhongji did not raise this issue before Commerce or in its complaint, but now claims the court should excuse its failure to exhaust available remedies because Aristocraft and Jacobi constitute intervening "judicial interpretations of existing law . . . which if applied might have materially altered the result."  Pl.'s Reply at 24 (quoting Hormel v. Helvering, 312 U.S. 552, 558-59 (1941)).  The court is not convinced that the relevant findings of Aristocraft or Jacobi constitute new interpretations of law capable of materially altering the outcome of the present case, and therefore finds that Zhongji failed to exhaust its available remedies with respect to the validity of the VAT deduction.  In any event, the court is poorly situated to address arguments that Commerce did not consider and that the parties discussed in only cursory fashion in their briefs and at oral argument.  See Unemployment Compensation Comm'n v. Argon, 329 U.S. 143, 155 (1946) ("A reviewing court usurps [the agency's] function when it sets aside an agency determination upon a ground not theretofore presented and deprives the agency of an opportunity to consider the matter, make its ruling, and state the reasons for its action."); Boomerang Tube LLC v. United States, 856 F.3d 908, 910 (Fed. Cir. 2017) ("[A]bsent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."); Corus Staal BV v. United States, 856 F.3d 1370, 1379 (Fed. Cir. 2017) (noting that the Federal Circuit takes "a strict view of the requirement that parties exhaust their administrative remedies before . . . Commerce in trade cases") (internal quotations omitted); AIMCOR v. United States, 141 F.3d 1098, 1111–12 (Fed. Cir. 1998).  Because the issue was not properly raised, the court does not address it here.

later deadline, which fell on October 4, 2017, by publishing its preliminary determination in the Federal Register on November 2, 2017.  Preliminary Determination, 82 Fed. Reg. 50,858. However, Commerce's late filing of a preliminary determination does not preclude it from issuing an affirmative preliminary determination, as precedent dictates that statutory deadlines are not mandatory in the absence of an express statement of consequences from Congress.  In light of this precedent, the court affirms Commerce's affirmative preliminary determination and collection of duty deposits notwithstanding the missed deadline.

In Husqvarna Construction Products v. United States, 36 CIT 1618 (2012), this court examined the legality of an administrative review of an antidumping duty order issued after the deadline imposed by 19 U.S.C. § 1675(a)(1)(B).  The court found that when "no consequence is specified for noncompliance with the timing set forth in the statute, Commerce is under no clear duty to issue the final results [of an antidumping duty investigation] within the statutory timeframe."  Id. at 1625; see also Mitsubishi Polyester Film, Inc. v. United States, 41 CIT __, __, 228 F. Supp. 3d 1359, 1382 (2017) (finding that a time period provision was "directory, not mandatory, as it [did] not specify a consequence for failure to comply").  Federal Circuit and Supreme Court case law also support this principle.  See, e.g., Barnhart v. Peabody Coal Co., 537 U.S. 149, 161 (2003) ("[A] statute directing official action needs more than a mandatory 'shall' before the grant of power can sensibly be read to expire."); Hitachi Home Elecs. (Am.), Inc. v. United States, 661 F.3d 1343, 1347 (Fed. Cir. 2011) ("[W]hen Congress intends there to be consequences for noncompliance with statutory deadlines for government action, it says so expressly."); Liesegang v. Sec'y of Veterans Affairs, 312 F.3d 1368, 1376–77 (Fed. Cir. 2002) ("Our own precedent has faithfully applied this rule of law as formulated by the Supreme Court . . . that, 'even in the face of a statutory timing directive, when a statute does not specify the

consequences of non-compliance, courts should not assume that Congress intended that the agency

lose its power to act.'") (quoting Kemira Fibres Oy v. United States, 61 F.3d 866, 871 (Fed. Cir.

1995)).  Section 1673b prescribes no consequence for failure to comply with the deadlines it

imposes and must therefore be read as merely directory and not required for Commerce to issue

an affirmative preliminary determination.

Zhongji contends that Husqvarna is distinguishable because it does not specifically address

the provisions of 19 U.S.C. § 1673b and because the Commerce action in question was a review

and not an investigation as in the present case.  Pls.' Br. at 44.  These arguments are unpersuasive,

as nothing in the aforementioned case law suggests that the directory nature of statutory deadlines

is limited to deadlines in certain statutes or to certain stages of an agency's investigative process.

Zhongji also argues that a consequence for noncompliance with the statutory deadline is implicit

because Commerce's ability to impose duties is contingent on its issuance of an affirmative

preliminary determination consistent with § 1673b, so failure to meet the statutory deadline

precludes Commerce from imposing duties.  This argument contradicts the aforementioned case

law requiring an express statement from Congress to impose consequences for noncompliance

with statutory deadlines.  See Hitachi Home, 661 F.3d at 1347.  This claim also presupposes

Zhongji's own conclusion that Commerce can only impose duties if it complies with the statutory

deadline, and therefore lacks merit.

Zhongji further contends that there is:

no discernible reason to perform the review of China's market economy status in
the context of the antidumping duty investigation of aluminum foil, nor any
indication that the resources dedicated to that effort had any relation to the
aluminum foil investigation, nor did Commerce's report on China's market
economy status discuss the Chinese aluminum foil industry.

Pls.' Reply at 26.  These arguments are unpersuasive.  An antidumping duty investigation on

aluminum foil exported from the PRC must necessarily concern itself with whether the PRC is a

nonmarket economy to comply with 19 U.S.C. § 1677b, because whether the subject merchandise

is exported from a market or nonmarket economy determines the method by which Commerce

must calculate normal value.

Additionally, the fact that Commerce did not conduct the review of the PRC's nonmarket

economy status with the same resources used for this antidumping duty investigation does not

negate the benefits to the investigation of awaiting the outcome of the review in order to achieve

the most accurate valuation possible.  Legislative history indicates that the accuracy of

Commerce's determinations is equally if not more important than compliance with statutory

deadlines.[8]  Section 1677b prescribes different methods of dumping margin classification for

market and nonmarket economies, and the outcome of the review of the PRC's status was thus

integral to the accuracy of Commerce's calculation.  Hence, Commerce had reason to delay its

preliminary determination until the review was completed.  The court therefore affirms

---

[8]  The Uruguay Round Agreements Act amended the trade remedy statutes, including their statutory deadlines.  Uruguay Round Agreements Act, H.R. 5110, 103rd Cong. (1994).  The Statement of Administrative Action, "regarded as an authoritative expression by the United States concerning the interpretation and application" of the Act, id. at § 102(d), states:

> The Administration is aware of prior complaints regarding delays in the completion of administrative reviews and the liquidation of entries, and intends to do its utmost to ensure that Commerce and Customs are able to comply with the deadlines established by the bill.  At the same time, however, it is not the Administration's intent to sacrifice accuracy of results and fairness to the parties involved for the sake of speed.

Uruguay Round Agreements Act, Statement of Administrative Action, 1994 U.S.C.C.A.N. 4040, 4202 (Dec. 8, 1994) (emphasis added).

Commerce's affirmative preliminary determination and collection of duty deposits notwithstanding its deferral past the statutory deadline.[9]

## CONCLUSION

The court affirms Commerce's selection of primary surrogate country and data to value Zhongji's aluminum foil inputs, as Commerce was within its discretion under 19 U.S.C. § 1677b and Policy Bulletin 04.1 in making those selections based on the evidence in the record. Additionally, the court grants Commerce's request for a remand to recalculate its VAT adjustment using the correct sale price. Finally, the court affirms Commerce's preliminary determination and collection of duty deposits notwithstanding its violation of the statutory deadline. Within 90 days of the date of this order, Commerce shall file with the court and provide to the parties a revised determination of the VAT issue consistent with this opinion; thereafter, the parties shall have 30 days to submit briefs addressing the revised final determination to the court and the parties shall have 15 days thereafter to file reply briefs with the court.

**SO ORDERED.**

/s/   *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: August 15, 2019
           New York, New York

---

[9]  The court does not reach the Government's argument that Zhongji suffered no harm from the delay or Defendant-Intervenors' argument that the remedy sought by Zhongji is supported by neither statutory authority nor precedent.